**UNITED STATES OF AMERICA**
**MERIT SYSTEMS PROTECTION BOARD**

JOHN CAREY WILLIAMS,
                    Appellant,

                v.

DEPARTMENT OF EDUCATION,
                    Agency.

DOCKET NUMBER
AT-0752-20-0541-I-1

DATE: February 21, 2023

# THIS ORDER IS NONPRECEDENTIAL[1]

Pamela Keith, Esquire, Washington, D.C., for the appellant.

Michael S. Taylor, Esquire, Washington, D.C., for the agency.

**BEFORE**
Cathy A. Harris, Vice Chairman
Raymond A. Limon, Member
Tristan L. Leavitt, Member

**REMAND ORDER**

¶1    The agency has filed a petition for review of the initial decision, which reversed the agency action reducing the appellant in grade based on a charge of failure to maintain a required certification.  For the reasons discussed below, we GRANT the agency's petition for review, VACATE the portion of the initial

---

[1]  A nonprecedential order is one that the Board has determined does not add significantly to the body of MSPB case law.  Parties may cite nonprecedential orders, but such orders have no precedential value; the Board and administrative judges are not required to follow or distinguish them in any future decisions.  In contrast, a precedential decision issued as an Opinion and Order has been identified by the Board as significantly contributing to the Board's case law.  *See* 5 C.F.R. § 1201.117(c).

decision finding that the appellant established that he was entitled to convert his existing certification, and REMAND the case to the Atlanta Regional office for further adjudication in accordance with this Remand Order.

**BACKGROUND**

¶2      The appellant was hired by the agency as a GS-14, Step 10 Contract Specialist in May 2016.  Initial Appeal File (IAF), Tab 11 at 5, 14.  Immediately prior to his appointment with the agency, the appellant was not actively employed for approximately 1 year while he cared for his mother.  Hearing Transcript (HT) 1 at 235-36 (testimony of the appellant); *see* IAF, Tab 5 at 6-7.  Prior to that, he worked in various contracting and acquisitions-related roles for private companies, the Department of Defense, and the U.S. Army for nearly 15 years.  IAF, Tab 5 at 7-13.  The appellant obtained a Defense Acquisition Workforce Improvement Act (DAWIA) Level III certification in September 2007, while employed as a civilian employee with the Department of the Army and joined the U.S. Army Acquisition Corps in November 2008.  IAF, Tab 10 at 32-33, 37, 47-48.

¶3      As a Contract Specialist with the agency at the GS-14 level, the appellant was required to "serve[] as a warranted Contracting Officer for pre- and post-award functions" for acquisition contracts on the agency's behalf, and one of the major duties identified in the GS-14 position description required that the incumbent "[s]erves as an official authorized to obligate the United States with unlimited signatory authority for a significant system or program." *Id.* at 18.  In order to act as a signatory authority for an "unlimited warrant" (i.e., a warrant for contracts valued in excess of $10 million), the agency required its contracting personnel to, *inter alia*, obtain and maintain a Level III Federal Acquisition Certification in Contracting (FAC-C Level III).  IAF, Tab 12 at 208-09; *see* IAF, Tab 25 at 199.

¶4        By letter dated February 13, 2020, the agency proposed to reduce the appellant in grade from a GS-14, Step 10 Contract Specialist to a GS-12, Step 10 Contract Specialist based on the charge of failure to maintain a required certification.  IAF, Tab 11 at 5-11.  Specifically, the agency concluded that the appellant failed to obtain a FAC-C certification as required for his position at the GS-14 level.  *Id.* at 8.  After considering the written response to the proposal provided by the appellant's union representative, *see* IAF, Tab 10 at 28-119, the agency sustained the charge and reduced the appellant in grade to a GS-12 Contract Specialist, effective May 29, 2020.  *Id*. at 18-26.

¶5        The appellant filed a Board appeal challenging his reduction in grade and requested a hearing.  IAF, Tab 1 at 2.  He did not raise any affirmative defenses in connection with his appeal.  After holding the appellant's requested hearing, IAF, Tabs 34, 37, the administrative judge issued an initial decision that reversed the reduction in grade and ordered the agency to restore the appellant to his GS-14, Step 10 Contract Specialist position, IAF, Tab 42, Initial Decision (ID) at 1, 12.  The administrative judge determined that based on his review of the record, the appellant had demonstrated that he met each of the specific criteria identified in the agency's policies required to obtain a FAC-C Level III certification, and so the agency failed to carry its burden of proving that the appellant was not qualified for a FAC-C Level III certification at the time it reduced his grade.  ID at 8-11.  The administrative judge further determined that if the agency had properly awarded the appellant the FAC-C Level III certification for which he qualified, the appellant would have met the necessary requirements to be awarded an unlimited contracting warrant and thus would have been capable of performing the full range of his duties at the GS-14 level.  ID at 11-12.  Because the agency's decision to deny the appellant the certification necessary to perform his job duties was improper, the administrative judge concluded that the agency failed to prove its charge and so the reduction in grade decision had to be reversed.  ID at 12.  The administrative judge also ordered the

agency to provide interim relief to the appellant in accordance with 5 U.S.C. § 7701(b)(2)(A) if either party filed a petition for review.  ID at 13.

¶6        The agency has filed a petition for review of the initial decision arguing that the administrative judge made erroneous material findings of fact in determining that the appellant met the FAC-C Level III certification requirements.  Petition for Review (PFR) File, Tab 1 at 4-18.  The agency has also certified its compliance with the administrative judge's interim relief order. *Id.* at 20-21.  The appellant has filed a response in opposition to the petition for review, and the agency has filed a reply.  PFR File, Tabs 3-4.  The appellant also filed a pleading alleging that the agency failed to comply with the administrative judge's interim relief order.  PFR File, Tab 5.  Finally, the appellant filed a pleading styled as a petition to enforce the initial decision and to order the agency to provide interim relief and the agency filed a response.  PFR File, Tabs 9, 11.

## DISCUSSION OF ARGUMENTS ON REVIEW

¶7        On review, the agency argues that the administrative judge made two erroneous findings of material fact.  PFR File, Tab 1 at 4.  First, it argues that the administrative judge arbitrarily and improperly construed the agency's policies concerning how it calculates the number of continuous learning points ("CLPs") FAC-C certification applicants must maintain in order to convert their existing certification under a different acquisition certification system, the Defense Acquisition Workforce Improvement Act (DAWIA), to a FAC-C certification. *Id.* at 8-15.  The agency argues that based on his erroneous interpretation of its policies, the administrative judge incorrectly concluded that the appellant had a sufficient number of CLPs to convert his DAWIA certification to a FAC-C. *Id.*

¶8        Second, the agency argues that, even assuming the administrative judge's improper interpretation of its policies, he still erred when he miscalculated the number of CLPs the appellant had earned by double-counting one of the courses, resulting in the appellant being credited with more CLPs than he had actually

earned. *Id.* at 15-17. The agency argues, even under the administrative judge's erroneous interpretation of the policies, that after removing the double-counted course from the appellant's CLP count, he did not have a sufficient number of CLPs to qualify for conversion of his DAWIA certification to a FAC-C. *Id.* at 16-17. The agency argues that because all GS-14 Contract Specialists were required to obtain a FAC-C Level III certification—without which the appellant could not perform the essential functions of his position at the GS-14 level—it established a nexus between his failure to obtain the certification and the reduction in grade, and that the grade reduction penalty was reasonable. *Id.* at 17-18. Consequently, it argues that the initial decision should be reversed and the agency action reducing the appellant's grade for failure to maintain a required certification should be sustained. *Id.* at 18.

The agency has complied with the administrative judge's interim relief order.

¶9		Before addressing the merits of the agency's arguments on review, we first address the issue of interim relief. When an administrative judge orders interim relief under 5 U.S.C. § 7701(b)(2)(A), an agency, in its petition for review, must certify that it has complied with the interim relief order either by providing the required interim relief or showing that it determined that the appellant's return to, or presence in, the workplace would be unduly disruptive. 5 C.F.R. § 1201.116(a). An agency's failure to provide the required certification with its petition for review or to provide evidence of compliance in response to a Board order on that subject may result in dismissal of the agency's petition for review. 5 C.F.R. § 1201.116(e).

¶10		With its petition for review the agency submitted a copy of a letter addressed to the appellant acknowledging that the initial decision ordered it to reinstate him to the GS-14 Contract Specialist position with the attendant pay and benefits while any petition for review was pending, as well as a Standard Form (SF) 50 showing that the appellant was promoted to the GS-14 position in order to "provide[] relief required by public law 101-12, pending final decision of the

MSPB." PFR File, Tab 1 at 20-21. The appellant appears to acknowledge that the agency reinstated him to his position as a GS-14 Contract Specialist, but argues that the agency only "partially complied" with the administrative judge's interim relief order for the following reasons: (1) it continued to deny him the right to take certain courses for his DAWIA certification; (2) failed to convert his DAWIA certification to a FAC-C Level III certification, insisting that he needed to take additional courses and provide course records; (3) refused to approve the transfer of his training record data to a new database; (4) included incorrect information on his promotion SF-50; and (5) placed him on an Individual Performance Plan. PFR File, Tab 5 at 4-10.

¶11     In a separate pleading, the appellant requests that the Board enforce the initial decision by ordering the agency to do the following: immediately pay him all back pay and interest due; award him a FAC-C level III certification and full contracting authority; refrain from requiring him to repeat previously-completed training courses; and cease and desist from retaliating against him. PFR File, Tab 9 at 4-10.

¶12     As an initial matter, to the extent the appellant is seeking to enforce the interim relief provisions of the initial decision, the Board's regulations do not allow for a petition for enforcement of an interim relief order, so the appellant's petition for enforcement is denied and we instead consider his pleading as a challenge to the agency's certification of compliance. *Elder v. Department of the Air Force*, 124 M.S.P.R. 12, ¶ 20 (2016); 5 C.F.R. § 1201.116(b). To that end, the appellant's argument that the agency is not in compliance with the administrative judge's interim relief order is without merit. The scope of the Board's review of the interim relief process is limited to determining whether the agency actually made an undue disruption determination and whether the employee has received appropriate pay and benefits. *King v. Jerome*, 42 F.3d 1371, 1374-75 (Fed. Cir. 1994); *Powers v. Department of the Treasury*, 86 M.S.P.R. 256, ¶ 6 (2000). With respect to the appellant's claim that his SF-50

includes incorrect information, he has not specified which information he believes is incorrect. Nevertheless, we have reviewed the provided SF-50 and conclude that the information contained in it is accurate and provides no reason to conclude that the agency is not in compliance with the administrative judge's interim relief order. *See* PFR File, Tab 1 at 21. Regarding the appellant's remaining allegations, none of his claims concern the pay and benefits of his position so they also do not provide a basis for concluding that the agency has not complied with the interim relief order.

¶13     The purpose of interim relief is not to make the appellant whole at the interim relief stage of the proceedings, but rather, to provide the limited relief of 5 U.S.C. § 7701(b)(2)(A) during the pendency of the petition for review process. *Johnston v. Department of the Treasury*, 100 M.S.P.R. 78, ¶ 25 (2005). Accordingly, under the circumstances, we find no basis upon which to dismiss the agency's petition for review for failure to comply with the administrative judge's interim relief order.

<u>The administrative judge erred by concluding the appellant established that he met the requirements to qualify for FAC-C Level III certification based on the record before him.</u>

> *Applicable legal standard for a charge of failure to fulfill a condition of employment.*

¶14     The charge of failure to fulfill a condition of employment contains two elements: (1) the requirement at issue is a condition of employment; and (2) the appellant failed to meet that condition. *Gallegos v. Department of the Air Force,* 121 M.S.P.R. 349, ¶ 6 (2014). Absent evidence of bad faith or patent unfairness, the Board defers to the agency's requirements that must be fulfilled for an individual to qualify for appointment to, or retention in, a particular position. *Id.,* ¶ 9. However, in appeals such as this, when the agency controls the withdrawal or denial of its certification or approval of an employee's fitness or other qualification for the position, the Board's authority generally extends to a review of the merits of that withdrawal or revocation. *Adams v. Department of the Army*,

105 M.S.P.R. 50, ¶¶ 10, 19 (2007), *aff'd*, 273 F. App'x 947 (Fed. Cir. 2008); *Laycock v. Department of the Army*, 97 M.S.P.R. 597, ¶¶ 2, 14-18 (2004) (considering the merits of the agency's withdrawal of the appellant's qualifications as an attorney), *aff'd*, 139 F. App'x 270 (Fed. Cir. 2005); *Graham v. Department of the Air Force,* 46 M.S.P.R. 227, 229, 233-37 (1990) (considering a medical officer's failure to maintain agency medical credentials).

¶15 Here, the parties do not dispute that the appellant was required to maintain an unlimited warrant as a part of his essential job duties at the GS-14 level, and that to obtain an unlimited warrant under the agency's policies, a GS-14 Contracting Officer seeking a warrant after January 1, 2007, like the appellant, had to obtain and maintain a FAC-C Level III certification, among other things. IAF, Tab 11 at 18, Tab 12 at 208-09. Consequently, the only matter at issue on review is whether the agency established that the appellant failed to meet that condition of employment.

*Background information on the FAC-C certification.*

¶16 As previously noted, as a part of his job duties as a GS-14 Contract Specialist, the appellant was required to act as a signatory authority for "unlimited warrant" contracts, and to be eligible for an unlimited warrant, he was required to possess the core competencies required for a FAC-C Level III certification. IAF, Tab 12 at 208-09; *see* IAF, Tab 11 at 18, Tab 25 at 199. As described in the agency's Acquisition Certification Program for Contracting Professionals, the FAC-C certification program was established in response to instructions by the Office of Management and Budget (OMB) to civilian agencies to create a uniform certification program for contracting professionals to "standardize the education, training, and experience requirements for acquisition professionals." IAF, Tab 12 at 195.[2] The current FAC-C certification process

---

[2] As the administrative judge observed, the entity responsible for setting the FAC-C training curriculum, the Office of Federal Procurement Policy, has revised the program

was modeled after the Department of Defense's (DoD) DAWIA certification process and was created with the goal of "establish[ing] policies and a government-wide standard for skills-based training for the Federal acquisition workforce" by "more broadly defining the acquisition workforce and more closely aligning civilian and defense acquisition workforce requirements." *Id.* at 195-96.

¶17    The FAC-C certification process has five major components: (1) core competencies; (2) education; (3) training; (4) professional experience; and (5) a continuous learning requirement. *Id.* at 202-03. Further, the FAC-C has three different certification levels, Level I, Level II, and Level III, each of which has different education, training, and years of experience requirements. *Id.* at 204-05, 207.

¶18    All three levels specify that, to maintain a FAC-C certification, "acquisition professionals are required to earn 80 CLPs of skills currency every two years." *Id.* at 204-05. The agency's contracting officer warrant requirements also specify that all Department of Education employee warrant holders "are required to meet a minimum of 80 CLPs every two years to maintain the contracting officer's warrant." *Id.* at 207.

¶19    As an alternative to applying for a FAC-C, an employee may instead seek to convert their existing DAWIA certificate into a FAC-C certificate at the same level. IAF, Tab 12 at 206, Tab 25 at 55. This process may be completed in one

requirements several times since its introduction. IAF, Tab 12 at 195-96; *see* ID at 3-5. The record includes copies of both the 2008 and 2014 versions of the policy, but the appellant argued below and testified during the hearing that the agency used the 2008 version of the policy in assessing his FAC-C conversion application, and that he was only ever provided a copy of the outdated 2008 version of the policy. IAF, Tab 25 at 9-10; HT 2 at 11-15 (testimony of the appellant); *see* IAF, Tab 11 at 5, 11, 23-84; *compare* Tab 12 at 193-254, *and* Tab 25 at 197-219, *with* Tab 25 at 57-118. We have reviewed both versions of the policy and conclude that there is no substantive difference between the two policies with respect to the provisions relevant to this appeal—those governing the proper calculation of CLPs for the purpose of a FAC-C conversion application and the procedures related to the fulfillment process. *See* IAF, Tab 12 at 203-07, 219-50, Tab 25 at 67-72, 83-114.

of three ways; first, if the DAWIA certificate is current, the applicant can convert the DAWIA certificate by demonstrating that they meet the FAC-C education requirements at the same level. IAF, Tab 25 at 55. Second, if the DAWIA certificate is over 2 years old and the applicant has maintained 80 CLP credits for each 2-year period since they obtained the DAWIA certificate, they can convert it by proving that they meet the education requirements and submitting their CLP training record for validation. *Id.* Finally, if an applicant has a lapsed DAWIA certificate, but has not maintained the 80 CLP credit requirement for each 2-year period since they obtained the certificate, they can complete additional CLP credits "until the maintenance standard is reached."[3] *Id.* Regardless of the method by which conversion occurs, the agency's documents specify that the DAWIA certification "must be **current** to be converted to FAC-C certification." *Id.* at 56. (Emphasis in original).

¶20    Finally, as an alternative to the direct FAC-C certification application or DAWIA certificate conversion processes, the third way a candidate can obtain a FAC-C certification is through the fulfillment process. IAF, Tab 12 at 206. Fulfillment is a process by which "candidates must submit, and supervisors must review, evidence as to how the required competencies for a particular certification level were attained through alternative training, experience, education, certification by another recognized organization, or other developmental activities." *Id.* at 206, 223. Applicants can complete a fulfillment application by submitting a spreadsheet with narrative justifications explaining

---

[3] The chart used by the Acquisition Career Manager (ACM) states that an applicant can requalify for a FAC-C certification if they meet the "training, education, **or** experience" requirements outlined in the agency's policies. IAF, Tab 25 at 55 (emphasis added). However, based on the context and other material in the agency's policies, we agree with the agency's argument on review that the use of "or" in this context, indicating that an applicant need only meet one of the three requirements, was a typographical error and instead, that all three of these requirements must be met for conversion to a FAC-C certification. *See* PFR File, Tab 1 at 7 n.3; IAF, Tab 12 at 204-06.

how they meet each of the core competencies, and the fulfillment packages are reviewed by the Acquisition Career Manager (ACM) in coordination with the applicant's first-level supervisor. *Id.* at 200-01, 206, 223-50. After recounting the above information, the administrative judge considered whether the appellant established that he met the requirements for certification through any of the three potential methods. ID at 7-12.

> *We agree with the administrative judge's finding that the appellant did not meet the education, training, and experience requirements for a FAC-C Level III certification.*

¶21 In May 2014, the agency expanded the core curriculum necessary to be certified at the various FAC-C levels. ID at 8. Specifically, for Level III, the training requirements included completion of CON 360, as well as completion of 1 of 6 specific courses (ACQ 315, ACQ 370, CON 370, ACQ 265, CON 244, CON 252), completion of 32 hours of electives, and completion of one HBS business module other than HBS 428. *Id.* After reviewing the appellant's training records, the AJ concluded that the appellant had not completed the courses necessary to meet the training requirements for each of the three FAC-C certification levels. We agree.

> *The administrative judge's finding that the appellant could qualify for conversion of his DAWIA certification to a FAC-C certification is not supported by the record.*

¶22 In analyzing whether the appellant qualified for conversion, the administrative judge noted that to be eligible for conversion to a FAC-C certificate at the same level, the DAWIA certificate must be "current" and that there was no dispute that the appellant's DAWIA III certification had lapsed. ID at 9-12. Specifically, the appellant's certification lapsed when he failed to complete the required number of CLPs during the 2013 to 2015 certification

maintenance cycle.[4] *Id.* Nevertheless, the administrative judge noted that based on documentation included in the record, an employee with a lapsed DAWIA certificate could convert that certificate to a FAC-C certificate at the same level by accruing additional CLPs until the maintenance standard was reached. ID at 9. The administrative judge continued that, in order to maintain a certification, an employee must earn 80 CLPs every 2 years and thus, if the appellant could demonstrate that he earned 80 CLPs "during any pertinent 2-year period after he was hired by the agency," he would have established that he qualified for a FAC-C certification at the same level as his DAWIA certification. *Id.*

¶23    On review, the agency argues that the administrative judge erred when he concluded that the appellant could establish his qualification to a FAC-C certification based on conversion of his DAWIA certification if he showed that he earned 80 CLPs during "any pertinent 2-year period after he was hired by the agency," noting that the administrative judge did not cite to anything in the record to support this conclusion. PFR File, Tab 1 at 8. We agree. There is nothing in record to support the administrative judge's finding that the appellant could convert his lapsed DAWIA certification to a FAC-C certification at the same level if he showed that he earned 80 CLPs during "any pertinent 2-year period" after he was hired by the agency. Instead, we conclude that all of the evidence, including the plain language of the agency's policies, the testimony provided by the agency official responsible for approving certification requests, and the other documentary evidence, make clear that, in order to qualify for

---

[4] As is the case with maintenance of a FAC-C certification, in order for a DAWIA certificate to remain current and valid under DoD regulations (that is, in order to be entitled to renewal of an existing certification at the end of each 2-year renewal period), certification holders are required to "engage in at least 80 hours of [continuous learning (CL)] every 2 years (with a goal of engaging in 40 hours annually), commencing from the time the member enters an [Acquisition Work Force] position . . . ." DoD Instruction 5000.66, *Defense Acquisition Workforce Education, Training, Experience, and Career Development Program*, §§ 6.1.k, 6.3.a-b, G.1 (Sep. 13, 2019).

conversion of a lapsed DAWIA certification to a FAC-C certification at the same level, an applicant must demonstrate that they reached the "maintenance standard" to get their lapsed certification current, meaning that they earned at least 80 CLPs for *each* 2-year period from the date of initial certification, through the date of the conversion application.

¶24     As the agency notes, the agency official responsible for assessing conversion requests, the ACM, utilized a chart explaining how the CLP maintenance requirement works as a part of her review of the appellant's conversion application. IAF, Tab 12 at 20-21, 23-24. The chart, which is included in the record, provides an illustrative example for how to calculate the 80 CLP maintenance requirement over the course of multiple "maintenance cycles," which are defined as each 2-year period following the acquisition date of the certification for which conversion is being sought. *Id.* at 24. In the provided example, the hypothetical applicant received their DAWIA certification on January 22, 2008, and applied for FAC-C certification in February 2016, representing an 8-year period, or 4 full maintenance cycles. *Id.* The example notes that because 4 full maintenance cycles had elapsed since initial certification, 80 CLP credits were required for each maintenance cycle, meaning that 320 total CLPs would be required for that hypothetical applicant to get their expired DAWIA certificate current and convert the DAWIA certificate to a FAC-C certificate at the same level. *Id.*

¶25     Other evidence in the record also supports the conclusion that the CLP maintenance requirement applied to each maintenance period as opposed to any single maintenance period, as the administrative judge determined. In an email the ACM sent to the appellant explaining why his FAC-C conversion application was being denied, the ACM explained that the appellant's "continuous learning (CL) cycles [ran] from 2006-2014 (e.g. four cycles)," but that based on the CLP spreadsheet self-certification documentation the appellant submitted, he was "only compliant (meaning [the appellant] met the 80 point requirement) in 1 of 4

CL cycles from 10/1/2010-9/30/2012." IAF, Tab 12 at 5. The ACM concluded the email by stating that based on the appellant's own documentation "I am not seeing any official document(s) that validate you meeting the required number of continuous learning points," informing the appellant "you still do not meet the required points for *each CL cycle* according to the requirements of [the Office of Federal Procurement Policy] and FSA FAC-C policy . . . ." *Id.* (emphasis added).

¶26        Requiring that FAC-C conversion applicants with existing certifications meet the biennial CLP requirement in every 2-year period also aligns with the agency's stated goal of "creating a federal acquisition workforce with the skills necessary to deliver best value products and services." IAF, Tab 12 at 195. Mandating applicants for conversion to prove that they have maintained currency in their existing certifications ensures the agency that such applicants have received consistent, periodic training on acquisition-related topics over the course of their careers. *See id.* at 203 (noting that "CLPs can be used to assist employees in obtaining core competencies, maintaining critical acquisition skills, and acquiring agency-specific training," and that a "FAC-C will expire if the 80 CLPs are not earned every two years.").

¶27        There is further support for this reading of the agency's policy (i.e., requiring that the 80 CLP 2-year maintenance requirement is satisfied in each maintenance cycle) in testimony offered by the ACM at the hearing. In direct testimony on this point, the ACM testified that the 2-year CLP maintenance periods are calculated from the date that the certificate was first obtained, and that applicants must "show that they met the 80 point requirement in every continuous learning cycle" thereafter, emphasizing that it "depends on when the certificate was achieved, how many continuous learning cycles they're going to have in the period to show me that they met the 80 point requirement." HT 1 at 17 (testimony of the ACM). Addressing the appellant specifically, she noted that because the appellant's DAWIA certification was issued in 2007, "he needed

to have every period laid out with the 80[-]point requirement of points that he met in each cycle." HT 1 at 40 (testimony of the ACM). The ACM later answered in the affirmative that a person converting their DAWIA certification to a FAC-C, "still [had] to prove that they met the 80 CLP requirement every two years[.]" *Id.* at 44.

¶28 The ACM stated that the appellant's problem arose from the fact that when he left DoD in 2013, he did not keep up with the biennial CLP requirement to keep his DAWIA certification current, so when he moved to the Department of Education and attempted to get his DAWIA certification current in order to apply for conversion to the FAC-C, he would "still need those 80 [continuous learning] points every two years." *Id.* at 81; *see* IAF, Tab 5 at 7-8.

¶29 The ACM also offered an example of an agency employee whose certification lapsed during a 2-year period because she was sick and unable to certify her compliance with the 80 CLP requirement at the time she was required to recertify. HT 1 at 81-82 (testimony of the ACM). As the ACM explained, that employee was able to later gather training record documents showing that she had completed 80 CLPs during that 2-year cycle where she lapsed, the training records were validated, and her certification was reinstated. *Id.* at 82.

¶30 The ACM again emphasized that an employee could reinstate a lapsed certification by producing a record of completed CLPs from the period where they were short of the 80 CLP requirement like the appellant attempted to do, but nevertheless made clear that the records had to show that the employee earned the CLPs "within that timeframe," otherwise the certification would be revoked and the employee's only recourse would be to obtain the certification again. *Id.* at 85-86.

¶31 The AMC noted that in the appellant's circumstance, "from September [20]13 through September [20]15, [the appellant] only got one CLP" and so he "didn't meet the 80 point requirement" for that maintenance cycle. *Id.* at 100-01.

¶32       The ACM subsequently summarized the maintenance requirement, noting that if the appellant could not show that he met the 80 CLP requirement "in each continuous learning cycle from the date of [his] certification . . . the conversion will never be approved because you need the documentation." *Id.* at 101. Thereafter, clarifying the administrative judge's mistaken conclusion that the appellant could never convert his DAWIA certification, the ACM testified that the appellant was not foreclosed from receiving his FAC-C fulfillment because he could either go through the fulfillment process or re-complete the process of "taking the classes and reapplying" for the FAC-C certification in the first instance. *Id.* at 104, 107-108.

¶33       Finally, the appellant appears to have confirmed in his own testimony that he understood he needed to meet the 80 CLP requirement in each 2-year period. *See* HT 1 at 264-65 (testimony of the appellant) ("Q: Okay. So in this email, at least from 2016, you were acknowledging that you do need to show that you earned CLPS, at least 80 CLPS, every two years to meet the FAC-C requirement? A: I knew that every two years I had to do 80 CLPS . . . . The requirement didn't change from DOD. You need that 80 CLPS. Q: Okay. A: Every two years."); *see also* IAF, Tab 25 at 14 (appellant's responses to agency interrogatories, acknowledging that conversion of a DAWIA certification to a FAC-C at the same level could be accomplished by "(A) Showing the (80) completion of continuous learning points *for each two year period* . . . .") (emphasis added).

¶34       In the initial decision, the administrative judge did not base his finding that the 80-point biennial CLP requirement could be met in "any pertinent 2-year period" on his observation of the witnesses' demeanor during the hearing, nor did he consider the relevant *Hillen* factors or otherwise make any credibility-based findings in the initial decision. ID at 7-12; *see Hillen v. Department of the Army*, 35 M.S.P.R. 453, 458 (1987) (setting forth the factors used to assess the credibility of a witness's testimony, including: (1) the witness's opportunity and capacity to observe the event or act in question; (2) the witness's character;

(3) any prior inconsistent statement by the witness; (4) a witness's bias or lack of bias; (5) the contradiction of the witness's version of events by other evidence or its consistency with other evidence; (6) the inherent probability of the witness's version of events; and (7) the witness's demeanor).  Instead, he appears to have reached this determination based on his own interpretation of the agency's policies.

¶35        Where, as here, an administrative judge's findings are not based on his assessment of witnesses' demeanor, the Board is free to re-weigh the evidence and substitute its own judgment on credibility issues, which we elect to do here. *Haebe v. Department of Justice*, 288 F.3d 1288, 1302 (Fed. Cir. 2002); *Hendricks v. Office of Personnel Management*, 109 M.S.P.R. 179, ¶ 8 (2008).  The ACM was the official charged with implementing the agency's policies related to FAC-C certifications and with approving certification requests, and thus would have been in the best position to interpret the agency's policy on this point, so we conclude that the first *Hillen* factor supports a finding that, based on the ACM's unrebutted testimony, FAC-C conversion applicants must obtain at least 80 CLPs in each 2-year period following certification for an existing certification to remain valid and convertible to the FAC-C.  *Hillen*, 35 M.S.P.R. at 458.  The ACM also testified consistently about the proper interpretation of the CLP maintenance requirement, even when asked for clarification on the issue from the administrative judge and when pressed by appellant's counsel on cross-examination, and her testimony was consistent with her prior guidance to the appellant on this point.  *See* IAF, Tab 12 at 5.  Accordingly, the third *Hillen* factor also supports this finding.  *Hillen*, 35 M.S.P.R. at 458.  Finally, the ACM's testimony concerning how to interpret the CLP maintenance requirement is consistent with the other evidence in the record, including the plain language of the agency's policy and the guidance materials the ACM used to assess conversion applications, so the fifth *Hillen* factor also supports crediting the

ACM's testimony on this point. *Id.*; *see* IAF, Tab 12 at 5, 23-24, Tab 25 at 55-56.

¶36 For the foregoing reasons, we credit the ACM's testimony stating that, to convert a DAWIA certification to a FAC-C certification at the same level, an applicant must demonstrate that they earned at least 80 CLPs during *each* 2-year period following initial certification, as opposed to meeting the 80 CLP requirement "during *any pertinent* 2-year period" following initial certification. *Cf.* ID at 11 (emphasis added). Accordingly, we conclude that the administrative judge's finding that the appellant could establish that he qualified for a FAC-C Level III certification based on the conversion of his DAWIA Level III certificate if he could demonstrate that he earned 80 CLPs during "any pertinent 2-year period after he was hired by the agency," is inconsistent with the plain language of the agency's policies, the record evidence, and the hearing testimony. Consequently, we vacate that finding and instead conclude that the agency's policies required the appellant to show that he met the 80 CLP maintenance requirement in each 2-year period following receipt of his DAWIA certification in 2007.

> *The appellant failed to establish that he earned a sufficient number of CLPs to reinstate his lapsed DAWIA certification and convert it to the FAC-C.*

¶37 As applied to the appellant's circumstances, it is undisputed that he first received his DAWIA Level III certification in September 2007 and applied for FAC-C conversion during the 2019 maintenance cycle. IAF, Tab 10 at 48, Tab 12 at 126. On review, the agency argues that the appellant is obligated to show that he met the maintenance requirement of 80 CLPs per maintenance cycle for the entirety of that 12-year period, representing six maintenance cycles, and so he must show that he earned a minimum of 480 CLPs to qualify for conversion of his DAWIA to a FAC-C certificate at the same level. PFR File, Tab 1 at 8-10. In the spreadsheet the appellant provided to support his conversion application, he

claimed that he earned 1,038.5 CLPs during the 6 maintenance cycles, breaking down the number of CLPs per maintenance cycle as follows: 468 CLPs for the September 2007 through September 2009 maintenance cycle; 354 CLPs for the September 2009 through September 2011 maintenance cycle; 35.5 CLPs for the September 2011 through September 2013 maintenance cycle; 1.0 CLPs for the September 2013 through September 2015 maintenance cycle; 92 CLPs for the September 2015 through September 2017 maintenance cycle; and 89.5 CLPs for the September 2017 through September 2019 maintenance cycle.[5]  IAF, Tab 12 at 25-31.

¶38     As previously noted, the administrative judge determined it was undisputed that the appellant's DAWIA certificate lapsed and was no longer "current" when he failed to complete the CLP maintenance requirement during the 2013 through 2015 certification maintenance cycle.  ID at 9; IAF, Tab 12 at 29; *see* DoD Instruction 5000.66, *Defense Acquisition Workforce Education, Training, Experience, and Career Development Program*, §§ 6.1.k, 6.3.a-b, G.1 (Sep. 13, 2019) (outlining the biennial 80 CLP maintenance requirement for DAWIA certifications).  Although the records submitted by the appellant appear to indicate that he only earned 35.5 CLPs during the September 2011 through 2013 maintenance period—short of the 80 CLPs required to keep his DAWIA certification current—the parties have not challenged the administrative judge's finding that the lapse first occurred during the September 2013 through September 2015 maintenance cycle.  IAF, Tab 12 at 25, 28; *see* HT 1 at 235-36

---

[5]  The record concerning the precise number of CLPs the appellant requested is admittedly unclear.  The uncertainty stems from the fact that the appellant requested validation for different numbers of CLPs at different times during the conversion application process.  *See, e.g.,* IAF, Tab 12 at 127 (certifying 1,488 CLPs); *id.* at 5-6 (certifying 683 CLPs); *id.* at 25-31 (certifying 1,038.5 CLPs).  It appears that the final number, 1,038.5 CLPs, was the figure used by the ACM in assessing the appellant's conversion application.  *See* IAF, Tab 25 at 25-31; HT 1 at 288-89 (testimony of the appellant) (acknowledging the 1,038.5 CLP figure).

(testimony of appellant) (acknowledging that he left his position at DoD in 2013 to take care of his mother for a year, then worked for a private contractor for a year starting in 2014 before joining the agency in 2016); Tab 5 at 6-8. Accordingly, we will limit our review of the appellant's CLP credit certification request to the period from September 2013 through September 2019, constituting three maintenance cycles. Based on a proper interpretation of the agency's policies, we conclude that the appellant was required to show that he earned at least 80 CLPs in each of the three maintenance periods from September 2013 through September 2019, or a total of at least 240 CLPs during that 6-year period, to establish that his lapsed DAWIA certification was current and eligible for conversion to a FAC-C certification at the same level.

¶39 During the hearing, the ACM testified about the process she uses to assess CLP certification requests, noting that points are generally awarded for any course that is "acquisition related" or related to the applicant's job, and that applicants generally requested validation for courses by identifying the start and end dates for the course, the course name, and how many points they were requesting for the course. HT 1 at 32-34 (testimony of the ACM). She noted that the number of points for a course is generally set by the Federal Acquisition Institute (FAI) or the course instructor, and that usually, one credit point is equal to one hour of training. *Id.* at 34 (testimony of the ACM). She also noted that upon completion of a course, attendees are usually awarded a certificate with the attendee's name, the dates of the course, and the number of CLPs awarded for the course. *Id.* at 33-34. Nevertheless, she noted that CLPs can still be awarded without a course certificate if applicants can demonstrate attendance at a qualifying course in other ways, such as by producing an email from the course instructor with the above information, but that applicants are ultimately responsible for providing proof of attendance and course point values, otherwise requests are disapproved. *Id.* at 34-35; *see* IAF, Tab 12 at 201 (noting that Contracting Professionals are "[r]esponsible for producing certificates,

transcripts, and records that provide evidence that the employee satisfies the [Department of Education Acquisition Certification Program (EDAC)] Program requirements.").

¶40 Addressing her review of the appellant's CLP certification request, the ACM testified that the appellant's disallowed courses were denied for a variety reasons, including because the appellant had not completed the coursework as claimed; had not yet completed the course at the time he requested to be awarded the points; the course was not worth the number of points requested; the course was not acquisition-related or related in any way to the appellant's job duties; the course was missing a certificate; or a certificate was provided but it failed to identify the number of points for the course, among others. IAF, Tab 12 at 20-21, 25-31; HT 1 at 41-46, 56-64, 70-76, 87-90 (testimony of the ACM); *see* IAF, Tab 12 at 32-124. We turn now to review the appellant's CLP requests for each of the relevant maintenance cycles.

September 2013 through September 2015 CLP maintenance cycle.

¶41 As previously noted, the appellant requested 1.0 CLP for the September 2013 through September 2015; 92 CLPs for the September 2015 through September 2017 maintenance cycle; and 89.5 CLPs for the September 2017 through September 2019 maintenance cycle. IAF, Tab 12 at 29-31. Based on our review of the entire record, it is unclear whether the ACM disallowed the single CLP for the course titled "Level 1 Anti-Terrorism Awareness Training" for the September 2013 through September 2015 maintenance period. First, the ACM did not include any annotations on the appellant's CLP spreadsheet for this course or provide any comments in her email addressing the spreadsheet entry for this course. IAF, Tab 12 at 20-21, 29. Additionally, although she provided testimony about her acceptance or disallowance of CLP requests for other courses, she did not provide any testimony about whether she disallowed this course. *See* HT 1 at 43-44 (testimony of the ACM) (acknowledging that the appellant requested 1 CLP for this course but otherwise failing explain whether the request was

approved or denied). Accordingly, for the purpose of our review here, we will assume, without deciding, that the appellant demonstrated his entitlement to the 1 requested CLP for the September 2013 through September 2015 maintenance period.

<u>September 2015 through September 2017 CLP maintenance cycle.</u>

¶42        Next, for the September 2015 through September 2017 maintenance cycle, although the appellant identifies that he earned 92 CLPs for this period, as the agency correctly observes, the sum of the course point totals the appellant certified in his spreadsheet for this maintenance cycle equals only 90 points, not the 92 points claimed in his total. *See* IAF, Tab 12 at 29. Of the 90 CLPs, the ACM's annotations and notes specifically disallowed 2 CLPs for the course titled "Planning for Retirement Seminars," 1 CLP for "Ed Telework," 1 CLP for "Mandatory EEO," and 1 CLP for "TMS ED Telework For Employee," on the basis that they were not valid courses for CLP purposes. IAF, Tab 12 at 21, 29. She also disallowed the 34 requested CLPs for the course "Maximizing Your Leadership Potential," noting there was no CLP point value included on the provided certification. IAF, Tab 12 at 29; HT 1 at 44-45 (testimony of ACM) (explaining the meaning of her annotations and that the requested CLPs for this course were not awarded because there was no certificate to validate the number of points requested). In her testimony, the ACM noted that although the course subject matter could qualify for CLPs, she could not award the appellant CLPs for this course because he could not produce a certificate that reflected the number of CLPs the course was eligible for. HT 1 at 87-89 (testimony of the ACM); *see* IAF, Tab 12 at 157. Another two courses, titled "Cyber Security" and "TMS Internal Control (2016)," each valued at 1 CLP, were denied for the same reason. IAF, Tab 12 at 29; *see id.* at 21, 99, 166. Consequently, 41 of the 90 CLPs from this period were specifically denied, leaving a remainder of 49 CLPs.

¶43        Of the remaining 49 CLPs, 36 CLPs were explicitly accepted, as denoted by "OK" annotations on the appellant's spreadsheet. IAF, Tab 12 at 29; *see* HT 1

at 45 (testimony of the ACM) (explaining that the "okay" annotation meant that the course date, name, point total, and course certificate information were all reviewed and deemed acceptable, and points were awarded for the request). However, the remaining 13 CLPs either had no annotations or a "question mark" annotation next to them, making it unclear whether the ACM intended to award points for those courses. IAF, Tab 12 at 29. There was no clarifying testimony provided on this point at the hearing. *See* HT 1 at 43-46 (testimony of the ACM). For the purpose of calculating the maximum number of CLPs the appellant may have earned, we will assume, without deciding, that these 13 points were properly awarded and included in the total. Adding the single CLP from the September 2013 through September 2015 maintenance cycle to the 49 CLPs from the September 2015 through September 2017 maintenance cycle results in a running total of 50 CLPs for the first two maintenance cycles.

September 2017 through September 2019 CLP maintenance cycle.

¶44 For the final maintenance period from September 2017 through September 2019, the appellant certified that he completed 89.5 CLPs. IAF, Tab 12 at 29-31. As an initial matter, as the agency correctly observes on review, the administrative judge incorrectly stated that the appellant claimed he earned 89 CLPs for the period from 2017 through 2019, when in fact, he claimed that he had earned 89.5 CLPs during the period. ID at 10-12; IAF, Tab 12 at 29-31; *see* PFR File, Tab 1 at 15 n.7. As a result of this misstatement, the administrative judge discounted the appellant's CLP count by the 0.5 CLP difference, carrying that difference over to his result and incorrectly determining that 53.5 CLPs for that maintenance period were "uncontested," instead of 54 CLPs. ID at 10-11.

¶45 Of the 89.5 total CLPs, the ACM annotated "OK" next to 51 of the points for this maintenance cycle. IAF, Tab 12 at 29-31; *see* HT 1 at 45 (testimony of the ACM). Although there is no "OK" annotation next to the course titled "Small Business Programs," for which the appellant requested 5 CLPs, the ACM appears to have awarded the appellant 2.5 out of the 5 CLPs for this course, indicating

that the course was worth 2.5 CLPs and annotating the appellant's spreadsheet to include the FAI course number associated with this course. *Id.* at 30; *see id.* at 14, 76; IAF, Tab 10 at 108-09. Adding this course with a value of 2.5 CLPs to the appellant's total, results in a total 53.5 CLPs uncontested for this maintenance cycle. Similarly, the appellant requested 1 CLP for the course titled "Cybersecurity and Privacy Awareness (CSPA) Training Course2 Catching the Phish (2019)," dated June 14, 2019. IAF, Tab 12 at 30. The ACM annotated the appellant's spreadsheet for this course, indicating that he was entitled to 0.5 CLPs instead of the 1 CLP requested for that course based on the "Fed talent record" which included the appropriate point value. *Id.*; *see* HT 1 at 60-61, 76 (testimony of the ACM) (noting that the appellant could receive credit for cybersecurity courses as long as they are not repeat courses within the same cycle, and that those course certifications are available in the "FED Talent" transcript validation system). Adding this course with a value of 0.5 CLPs to the appellant's total results in a total 54 CLPs uncontested for this maintenance cycle, and a remainder of 32.5 potential CLPs.[6]

¶46      The remaining 32.5 of "contested" CLPs are comprised of the following courses and point values: 5.5 CLPs for a course titled "Federal Acquisition – Back to Basics" dated February 7, 2017; another course worth 5.5 CLPs also

---

[6] Importantly, although the administrative judge determined that the ACM "questioned or disallowed a total of 35.5 CLPs," this figured failed to account for the reduced total number of CLPs available, due to the fact that the appellant had inflated the "Small Business Programs" course, valuing it at 5 CLPs instead of the 2.5 CLPs it was worth, and the "Cybersecurity and Privacy Awareness," course, valuing it at 1 CLP instead of the 0.5 CLPs it was worth. *See* IAF, Tab 12 at 30; ID at 10-11. After properly reducing the administrative judge's figure by 3 CLPs, the correct number of potential CLPs remaining is 32.5. As previously noted, the "uncontested" 53.5 CLP figure the administrative judge referenced must also be increased by 0.5 CLPs to account for the error he carried over into his totals. Consequently, the correct remaining figures are 54 uncontested CLPs and 32.5 contested CLPs. *Cf.* ID at 11 (noting that the ACM "questioned or disallowed a total of 35.5 CLPs, leaving the appellant with an uncontested total of 53.5 CLPs for that period.").

titled "Federal Acquisition – Back to Basics," but dated February 23, 2017; a 3 CLP course dated January 4, 2017, titled "FOIA Class"; a 1.5 CLP course on May 23, 2018 titled "Mandatory EEO training for Supervisor and Employees"; a September 20, 2018 course titled "Transit Benefits Integrity Awareness Training" worth 1 CLP; and a July 9, 2019 course titled "FAR Part 8" worth 16 CLPs. IAF, Tab 12 at 29-31.

¶47     The ACM denied both FSA Acquisition "Back to Basics" courses, including annotations on the appellant's spreadsheet stating "[h]andwritten [CLP values] isn't acceptable," and "no validation on cert for points." *Id.* at 29. Also included in the record are two copies of certificates of completion indicating that the appellant completed courses by this name on February 2, 2017, and February 23, 2017. *Id.* at 93-94. However, both certificates are unsigned and include handwritten CLP values, and have annotations written by the ACM indicating "No val of pts," and "[h]and written isn't acceptable," consistent with the ACM's identified reason for denying those courses. *Id.* at 92-93; *see* HT 1 at 41-46 (testimony of the ACM). The course titled "FOIA class" worth 3 CLPs was denied with the annotation "No cert provided." IAF, Tab 12 at 30. The courses titled "Mandatory EEO Training for Supervisors and Employees," worth 1.5 CLPs, and "Transit Benefits Integrity Awareness Training," worth 1 CLP, were both denied with the annotation "Can't use for CLPs." IAF, Tab 12 at 31. In explaining her disallowance of the Transit Benefits and EEO Training courses at the hearing, the ACM testified that that those courses were not eligible for CLPs because they were not acquisition-related training. HT 1 at 28-29, 62-63 (testimony of the ACM). Nothing in the record indicates that these courses were improperly disallowed, and the appellant has not challenged the ACM's disallowance of these courses on review.

¶48     Regarding the course titled "FAR Part 8," the ACM disallowed this course with the annotation "[n]ot completed can't count," and her notes accompanying the annotation indicate that the course was denied because the appellant "[c]an't

claim points for something that has not been completed," noting that the course "is in the future and again no way to validate with out [sic] a certificate." IAF, Tab 12 at 21, 31; *see* HT 1 at 46 (testimony of the ACM) (acknowledging that her annotations for this course stated "not completed. Can't count," and that the appellant's CLP request for this course had been denied). Despite the ACM's annotations and notes for this course, there does appear to be a certification in the record for a course with this name that the appellant completed on the identified dates. IAF, Tab 10 at 64. The certificate includes the course name, location, dates of attendance, CLP credit amount, and the appellant's name, meeting all the criteria that the ACM testified that she considers in deciding whether to award credit for a course.[7] IAF, Tab 10 at 64; *see* HT 1 at 32-34 (testimony of the ACM). For the purpose of calculating the maximum number of CLPs the appellant may have earned, we will assume, without deciding, that these 16 CLPs should have been awarded and included in his total, bringing the number of points awarded for this maintenance cycle up to 70 CLPs.

¶49 Finally, regarding the course titled "Agile Contracting," dated June 5, 2019, although the administrative judge determined that there was a certificate in the record indicating that the appellant had completed the course and that it was worth 16 CLPs even though the course was not included on the appellant's spreadsheet, as the agency correctly notes on review, the course is in fact listed on the spreadsheet the appellant submitted, and the spreadsheet includes an "OK"

---

[7] What may account for this discrepancy is the close proximity in time between when the appellant completed this course on July 9-10, 2019, and submitted it as part of his conversion package application, and when the ACM provided her email response to the appellant 2 days later on July 11, 2019, explaining that the course had been denied because it was "in the future" and there was no way to validate the course without a certificate. *See* IAF, Tab 10 at 64, Tab 12 at 20-21. Although the appellant completed this course in July 2019, it appears that he did not provide the certificate validating his attendance until February 25, 2020, well after the ACM had reviewed his CLP submission spreadsheet and denied his conversion application. *See* IAF, Tab 10 at 53-59, 64, Tab 25 at 173-74.

annotation from the ACM indicating that she awarded the appellant the 16 requested CLPs for that course. IAF, Tab 12 at 30; *see* IAF, Tab 10 at 65; ID at 11. Consequently, the record reflects that the ACM had already properly credited the appellant with the 16 CLPs for this course and included it in his point total, and so he should not have been awarded the additional 16 CLPs the administrative judge awarded him for this course. Removing this double-counted course results in a maximum total of 70 CLPs for the September 2017 through September 2019 maintenance cycle.

¶50    Adding the 70 CLPs for this maintenance cycle to the 50 CLPs the appellant earned during the September 2013 through September 2015 and September 2015 through September 2017 maintenance cycles, *see supra* at ¶¶ 36-38, we conclude that the appellant established that he earned a maximum of 120 total CLPs for the three maintenance cycles at issue here—far short of the 240 CLPs he was required to earn in order to get his lapsed DAWIA certification current and convert it to the FAC-C at the same level, based on a proper application of the agency's policies. *See* IAF, Tab 12 at 23-24, Tab 25 at 55-56.

¶51    As previously noted, in appeals such as this, where the agency controls the withdrawal or denial of its certification, the Board will review the merits of the withdrawal or revocation determination as a part of its review of a failure to maintain a condition of employment charge. *Adams*, [105 M.S.P.R. 50](), ¶¶ 10, 19. Based on our review of the entire record, we conclude that the agency properly denied the appellant's application to convert his lapsed DAWIA certification to a FAC-C Level III certification because he failed to establish that he had a sufficient number of CLPs to satisfy the maintenance requirement as determined by a proper application of the agency's policies. IAF, Tab 12 at 202-06. Consequently, we conclude that the administrative judge erred when he determined that the appellant established his entitlement to a FAC-C Level III certification based on conversion of his DAWIA certification, and so the agency failed to carry its burden of proving that the appellant could not perform his job

duties at the GS-14 level at the time it reduced him in grade based on his inability to qualify for the FAC-C certification necessary to obtain an unlimited warrant. ID at 11-12; *see* IAF, Tab 10 at 18-26; Tab 11 at 18; Tab 12 at 207-09.

Remand is nevertheless necessary for the parties to supplement the record and for the administrative judge to make new findings concerning whether the appellant submitted a fulfillment application package and whether the agency properly considered it.

¶52    As previously noted, in addition to the direct FAC-C application and conversion application processes, FAC-C applicants can also apply for certification through a process called fulfillment by providing "evidence as to how the required competencies for a particular certification level were attained through alternative training, experience, education, certification by another recognized organization, or other developmental activities." IAF, Tab 12 at 206, 223. The FAC-C fulfillment application follows the fulfillment process for DoD agencies "so that the DAWIA certification and FAC-C programs are closely aligned."[8] IAF, Tab 12 at 206.

¶53    The agency's policies specify that applicants may apply to satisfy the training requirement of the FAC-C application through fulfillment by completing a "self-assessment matrix" with supporting self-assessment documentation to be included with their FAC-C application to their immediate supervisor, and that the immediate supervisor "shall determine whether the individual has the competencies described by the course [for which the applicant is seeking fulfillment]." IAF, Tab 12 at 206, 223; *see id.* at 225-50. A supervisor can request additional information or conduct an interview with the employee to assess whether they meet the required competencies for fulfillment for the

---

[8] DoD Instruction 5000.66 outlines that agency's course fulfillment process, stating that fulfillment "provides a means for [Acquisition Work Force] members to receive credit for [Defense Acquisition University] courses for which they demonstrate competence through an assessment of their previous work experience, education, training, or any combination thereof." DoD Instruction 5000.66, § 6.1.i.

requested courses. *Id.* at 223. After reviewing the fulfillment package, the first-line supervisor "concurs or non-concurs on the fulfillment application enclosed," and "[t]he first line supervisor then approves or disapproves the completed application package." *Id.* The fulfillment materials are then forwarded along with the rest of the FAC-C application package materials for approval by the ACM. *Id.* at 209, 223.

¶54    Although the administrative judge acknowledged this alternative route for FAC-C certification, because he ultimately concluded that the appellant established that he qualified for conversion of his lapsed DAWIA certification to the FAC-C, he did not make any findings about the appellant's fulfillment package. ID at 3 n.3. Nevertheless, the administrative judge did determine that the agency had not offered any evidence suggesting that the appellant did not meet the education and experience core competency requirements for FAC-C certification, noting that the appellant had "almost 20 years of contracting experience as a civilian Federal employee or contractor," and had been awarded a baccalaureate degree from Tuskegee University in 1976. ID at 7-8; *see* IAF, Tab 5 at 6-14; Tab 10 at 48; Tab 12 at 204-07 (identifying that, for a FAC-C Level III certification, applicants must meet the education requirements of a baccalaureate degree and 24 semester hours of coursework, and the experience requirement of at least 4 years of contracting experience). The agency has not challenged this finding on review. Accordingly, if the appellant can show that he met the training core competency component through the course fulfillment process, he would have established his entitlement to a FAC-C certification through the fulfillment process.

¶55    On review, the agency asserts that the appellant failed to submit an appropriate fulfillment package even though it asked him to do so. PFR File, Tab 1 at 6. Nevertheless, the agency also notes that the appellant submitted a fulfillment narrative on November 12, 2019, "that did not sufficiently explain or articulate how [the appellant] met the defined competencies within each required

course," quoting from the reduction in grade decision letter. *Id.* (citing IAF, Tab 10 at 19-20). Conversely, the appellant argues on review that he submitted a fulfillment application for his FAC-C certification "based on [his] courses completed and more than (40) years of documented and verified work experience in acquisition . . . ," but that his fulfillment package was rejected because his first-line supervisor and the ACM "informed [him] that [he] did not have 'proof' of training records," even though he had provided all of his records and proof of training courses completed to the agency. PFR File, Tab 3 at 12-13.

¶56     In her hearing testimony addressing the fulfillment process, the ACM stated that the appellant could apply for fulfillment of the course training requirements but that to the best of her knowledge he had not attempted to do so, testifying that she had not "seen anything through the system" regarding fulfillment. HT 1 at 48 (testimony of the ACM). In cross-examination testimony on this point, appellant's counsel asked the ACM whether she had a specific recollection as to why the appellant had not been converted through fulfillment, to which the ACM stated "I haven't to date received anything through the system. So, no. At this point, no. I haven't reviewed or seen anything through the system for [the appellant] for fulfillment." HT 1 at 68 (testimony of the ACM).

¶57     The appellant testified that after agency officials informed him that his conversion application materials were inadequate, the ACM asked him to complete a fulfillment package and he provided fulfillment materials to the ACM and his first-line supervisor. HT 1 at 201 (testimony of the appellant). The appellant testified that his first-line supervisor "also rejected my fulfillment package," informing him that he "didn't have proof." *Id.* In response to a challenge by agency counsel suggesting that the first-line supervisor had denied ever rejecting the appellant's fulfillment package, the appellant specifically stated that this was "not accurate" and that his first-line supervisor "did have proof and he actually denied my fulfillment package," sending the appellant an email stating

that his package was not acceptable and he did not have proof to support his package.[9] *Id.* at 201-02.

¶58     The record also includes conflicting information regarding whether the appellant submitted a fulfillment application, and if so, whether the agency made a determination on his fulfillment application, and which agency official may have made any such determination. Included in the record is a document dated November 12, 2019, and titled "Use this for fulfillment," in which the appellant appears to offer fulfillment narrative explanations for a number of the courses required for the training competency requirements, in the format required by the agency's policies. IAF, Tab 10 at 104-15; *see* IAF, Tab 12 at 206, 223-50.

¶59     Additionally, in a November 13, 2019 entry in a self-titled "Timeline of events and actions I took to receive FAC C Conversion," the appellant noted that he sent an email that day to the ACM informing her that he had started to forward his "Fulfillment Courses and Write Up" so that his first-line supervisor could review them, and in an entry dated November 18, 2019, the appellant noted that after his supervisor had returned his coursework materials at his request, he received an email from the supervisor stating, "I am afraid your submission(s) as written are not reasonably sufficient to meet the policy standard.[] Submissions

---

[9] Although the appellant's first-line supervisor did testify that he "did not disapprove or reject any of [the appellant's] submissions," this testimony was offered in response to agency counsel's questions about the appellant's *conversion* application materials. HT 1 at 139-40 (testimony of appellant's first-line supervisor) ("Q: Did you disapprove of any of the submissions as to certification or completion of courses that [the appellant] gave *in attempt to achieve conversion?* . . . Q: So I'm clear, it's your testimony that you never disapproved certain coursework or packets? It was all [the ACM]? A: Yes. So I have to, as a first line supervisor, I have to flow it through.") (emphasis added); *id.* at 141 (testimony of appellant's first line supervisor) (Q: Well relying on your 20 years, and of course your own *conversion*, what in your opinion was the problem with [the appellant's] *conversion*? If anything.") (emphasis added). The supervisor did not provide any other testimony during the hearing specifically addressing whether he approved or denied the appellant's fulfillment application materials. *See id.* at 117-20, 138-43 (testimony of appellant's first-line supervisor).

cannot include Training which is not supported with actual certificates and Continuous learning points have no relevance in the Fulfillment submissions." IAF, Tab 10 at 57. Finally, in the reduction in grade decision letter, the deciding official concluded that the appellant failed to provide the necessary documentation to convert his DAWIA certification to the FAC-C, "and/or did not pursue the alternate fulfillment process to obtain your FAC-C certification," but also concluded that the appellant "resubmitted a previously denied Fulfillment package which [he] received supervisory feedback on the missing requirements for successful completion." IAF, Tab 10 at 20. Although the agency's policy materials include a fillable sample fulfillment "disposition" form that allows agency officials to document their disposition determination of an applicant's fulfillment request, *see* IAF, Tab 12 at 224, there is no completed form in the record related to any fulfillment request by the appellant.

¶60    Based on the record before us, we cannot discern whether the appellant submitted a fulfillment application package, and if so, whether the proper agency officials, as identified in the agency's policies, reviewed and acted on the appellant's request. Because the fulfillment process provides an alternative means for the appellant to acquire the FAC-C certification necessary to obtain the unlimited warrant required to compete his job duties at the GS-14 level, whether the agency properly denied the appellant's FAC-C application, and consequently, whether the agency met its burden of proving that the appellant failed to meet the required condition of his employment, ultimately turn on resolution of this question. *See Gallegos,* 121 M.S.P.R. 349, ¶ 6; *Adams*, 105 M.S.P.R. 50, ¶¶ 10, 19.

¶61    Accordingly, we remand the appeal to the administrative judge to allow the parties to supplement the record concerning the issue of the appellant's fulfillment application (including a supplemental hearing, if the administrative judge deems it necessary). After the parties have been permitted to supplement the record, the administrative judge shall issue a new initial decision addressing

the agency's charge, nexus, and penalty. *See Spithaler v. Office of Personnel Management*, [1 M.S.P.R. 587](#) 589 (1980) (stating that an initial decision must identify all material issues of fact and law, summarize the evidence, resolve issues of credibility, and include the administrative judge's conclusions of law and legal reasoning, as well as the authorities on which that reasoning rests).

## ORDER

¶62     For the reasons discussed above, we remand this case to the Atlanta Regional office for further adjudication in accordance with this Remand Order.

FOR THE BOARD:            /s/ for

                            Jennifer Everling
                            Acting Clerk of the Board

Washington, D.C.